UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ASHLEY R., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:20-cv-02817-TWP-TAB |
| | ) |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Ashley R.[2] requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "SSA"), denying her application for Supplemental Security Income ("SSI") under the Social Security Act. For the following reasons, the Court **remands** the decision of the Commissioner.

## I.   PROCEDURAL BACKGROUND

On November 6, 2017, Ashley R. filed an application for SSI, alleging a disability onset date of November 1, 2017. (Filing No. 12-5 at 2.) Her application was initially denied on January 18, 2018, (Filing No. 12-4 at 2), and upon reconsideration on May 25, 2018, (Filing No. 12-4 at 13). Administrative Law Judge Janet Akers, (the "ALJ") conducted a hearing on January 29, 2020, at which Ashley R., represented by counsel, and a vocational expert ("VE") appeared and testified. (Filing No. 12-2 at 33-55.) The ALJ issued a decision on March 4, 2020, concluding that Ashley

---

[1] After the removal of Andrew M. Saul as Commissioner of the SSA on July 9, 2021, Kilolo Kijakazi automatically became the Defendant in this case when she was named as the Acting Commissioner of the SSA.

[2] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first names and last initials of non-governmental parties in its Social Security judicial review opinions.

R. was not entitled to receive benefits. (Filing No. 12-2 at 13-25.) The Appeals Council denied review on August 31, 2020. (Filing No. 12-2 at 2.) On October 30, 2020, Ashley R. timely filed this civil action, asking the Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to review the final decision of the Commissioner denying her benefits. (Filing No. 1.)

## II.     STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). To be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled despite her medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that also meets the durational requirement, she is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments,

20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then her residual functional capacity will be assessed and used for the fourth and fifth steps. *See* 20 C.F.R. § 416.920(a)(4)(iv)-(v). Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite [her] mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1)[3]; Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996), 1996 WL 374184). At step four, if the claimant can perform her past relevant work, she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work, given her RFC and considering her age, education, and past work experience. 20 C.F.R. § 416.920(a)(4)(v). The claimant is not disabled if she can perform any other work in the relevant economy. *Id.*

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Stephens*, 888 F.3d at 327. For the purpose of judicial review, "substantial evidence" is such relevant "evidence that 'a reasonable mind might accept as adequate to support

---

[3] The Code of Federal Regulations contains separate, parallel sections concerning Disability Insurance Benefits and SSI, which are identical in most respects. Cases may reference the section pertaining to the other type of benefits. *See Craft*, 539 F.3d at 676 (citing 20 C.F.R. § 404.1545(a)(1)). Generally, a verbatim section exists establishing the same legal point with both types of benefits. *See, e.g.*, 20 C.F.R. § 416.945(a)(1). The Court will detail any substantive differences that are applicable to the case but will not always reference the parallel section.

a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327. Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)). The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). "An award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Id*. (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

### III.   FACTUAL BACKGROUND

When Ashley R. filed her application for SSI in November 2017, she alleged that she could no longer work because of bipolar disorder and schizophrenia. (Filing No. 12-6 at 6.) She was 26 years old when her alleged disability began. (*See* Filing No. 12-5 at 2.) She had completed the eighth grade with a history of special education. (Filing No. 12-2 at 34-35; Filing No. 12-6 at 7.) She had worked as a driver. (Filing No. 12-2 at 25.) The relevant evidence of record is amply set

4

forth in the parties' briefs, as well as the ALJ's decision and need not be repeated here. Below and in the discussion, are the facts relevant to the Court's disposition of this case.

In early 2017, Ashley R. attempted suicide after she had been off of her medications for several months due to lack of insurance. At her hearing, she testified that she takes medications for her impairments, but they get changed every three to four months because they quit working, then the voices come back and she becomes suicidal. (Filing No. 12-2 at 37.) Despite the last report to her treating providers that she had found a good medication combination, she testified that they were no longer working as they used to and her voices were getting worse again. *Id*. Even when her medications are working, she hears voices and has suicidal tendencies, but they are not as badly. *Id*. at 38. She often feels paranoid, and believes people are staring at her and are out to get her. *Id*. This makes it very difficult for her to go to the doctor or to the grocery store so she usually does not go by herself. *Id*. She has been working with a life skills instructor twice a week for several years who helps with medication management, getting to and from doctors' appointments, and reminders of appointments because she forgets. *Id*. at 39. Ashley R. has problems with intense anger and irritability that causes difficulty interacting with people. *Id*. She does not go out in public very often, she does not get along with others, and she has a hard time holding a job due to her anger issues. *Id*. at 40.

The ALJ followed the five-step sequential evaluation set forth by the SSA in 20 C.F.R. § 416.920(a)(4) and concluded that Ashley R. was not disabled. (Filing No. 12-2 at 26.) At step one, the ALJ found that Ashley R. had not engaged in substantial gainful activity[4] since November

---

[4] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 416.972(a).

6, 2017, the application date.[5] (Filing No. 12-2 at 18.) At step two, the ALJ found that Ashley R. had "the following severe impairments: generalized anxiety disorder; borderline personality disorder; bipolar II disorder; post-traumatic stress disorder ('PTSD') and schizoaffective disorder, depressive type." (Filing No. 12-2 at 18 (citation omitted).) At step three, the ALJ found that Ashley R. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Filing No. 12-2 at 19.) After step three but before step four, the ALJ concluded:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can perform, simple, routine and repetitive tasks; can work in two[-]hour blocks of time; can occasionally interact with supervisors[ and] coworkers incidental to [the] work being performed, working more [with] things rather than people; no contact with the public; and can respond appropriately to infrequent and gradual[] changes in a routine work setting.

(Filing No. 12-2 at 20.) At step four, the ALJ found, considering the VE's testimony and Ashley R.'s RFC, that she could not perform her past relevant work as a driver. (Filing No. 12-2 at 25.) At step five, the ALJ found, considering the VE's testimony and Ashley R.'s age, education, work experience, and RFC, that she could perform other work with jobs existing in significant numbers in the national economy in representative occupations such as a hand packager, laundry worker, and kitchen helper. (Filing No. 12-2 at 25-26.)

## IV.   DISCUSSION

Ashley R. makes one assertion, that the ALJ failed to properly apply SSR 16-3p when she evaluated her statements concerning her subjective symptoms. (Filing No. 14 at 18-30.)

When evaluating a claimant's subjective statements about the intensity and persistence of her symptoms, the ALJ must often, as here, make a credibility determination concerning the

---

[5] SSI is not compensable before the application date. 20 C.F.R. § 416.335.

limiting effects of those symptoms. *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Reviewing courts "may disturb the ALJ's credibility finding only if it is 'patently wrong.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015)). Reviewing courts examine whether a credibility determination was reasoned and supported; only when an ALJ's decision "lacks any explanation or support . . . will [a court] declare it to be 'patently wrong.'" *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). "Credibility determinations will not be overturned unless they are clearly incorrect.  As long as the ALJ's decision is supported by substantial and convincing evidence, it deserves this court's deference." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citations omitted); *see Alvarado v. Colvin*, 836 F.3d 744, 749 (7th Cir. 2016) (A credibility determination "tied to evidence in the record" may not be disturbed as patently wrong.).

On March 28, 2016, SSR 16-3p (S.S.A Oct. 25, 2017), 2017 WL 5180304, at *2, became effective, replacing SSR 96-7p, and providing new guidance regarding how disability claimants' statements regarding the intensity, persistence, and limiting effects of symptoms are to be evaluated.  According to SSR 16-3p, an ALJ assesses a claimant's subjective symptoms rather than assessing her "credibility." *Id*.  The Seventh Circuit has explained that the ALJ continues to assess claimants' assertions that cannot be credited or rejected based on the objective medical evidence, but the "change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character . . . ." *Cole*, 831 F.3d at 412.  If a fully favorable determination cannot be made based solely on the objective medical evidence, SSR 16-3p directs the ALJ to consider "all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms," including the regulatory factors relevant to a claimant's symptoms, such as daily activities, the location, duration, frequency, and intensity of pain or other symptoms,

7

factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; and treatment, other than medication, an individual receives or has received for relief of pain or other symptoms. 2017 WL 5180304, at *6-8; 20 C.F.R. § 416.929(c)(3).

The ALJ determined that Ashley R.'s impairments "could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Filing No. 12-2 at 21.) Throughout the decision, the ALJ gave several reasons for discounting Ashley R.'s subjective allegations concerning her mental impairments, including that "when she takes medications, her symptoms are controlled and she has minimal deficits on mental status exams." (Filing No. 12-2 at 21.) The ALJ may consider inconsistencies between the severity of symptoms that the claimant described to the SSA compared with when she was seeking treatment, the failure to regularly seek treatment for those symptoms, the level of treatment, and the effectiveness of treatment. *See e.g.*, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005); *see also Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (noting the deference given to the administrative factfinder on judicial review, as well as the regulatory guidance instructing the ALJ to consider such evidence). The ALJ detailed Ashley R.'s multiple emergency room visits because of suicidal ideation with reports of auditory hallucinations when she was observed to have tangential thought processes. (Filing No. 12-2 at 21.) But the ALJ also detailed that Ashley R. had not been taking her medications during those episodes reportedly because of a lack of funding, and when she did start medications, she often reported improvement with her symptoms including particularly her hallucinations. (Filing No. 12-2 at 21-22.) The ALJ also explained that Ashley R. was "noncompliant and not

forthright about her medications." (Filing No. 12-2 at 22.)  The ALJ cited evidence from March 2018 that Ashley R. was calling and asking for refills from one provider for medications that she was not prescribed, and she was also getting medications from another provider at the same time. (Filing No. 12-2 at 22 (citing Filing No. 12-7 at 274).)  The ALJ also reported that Ashley R. "was resistant to participating in group therapy."  (Filing No. 12-2 at 24 (citation omitted).)

The Seventh Circuit has explained that "[i]t is true that 'infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment.'" *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014) (quoting *Craft,* 539 F.3d at 679).  "But the ALJ may not draw any inferences 'about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations . . . .'" *Id*. (quoting *Craft*, 539 F. 3d at 679).  The Court notes that *Craft* was applying the since rescinded SSR 96-7p.  539 F. 3d at 679.  However, SSR 16-3 includes substantially the same relevant guidance:

> In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.  We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.

2017 WL 5180304, at *9.  Notably, when considering a claimant's treatment history, the SSA's guidance says that an ALJ may consider that "[d]ue to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment," or that "[d]ue to a mental impairment (for example, individuals with mental impairments that affect judgment, reality testing, or orientation), an individual may not be aware that he or she has a disorder that requires treatment." *Id*. at *9-10.

9

"For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) (citing *Pate–Fires v. Astrue,* 564 F.3d 935, 945 (8th Cir. 2009) (listing cases recognizing that a mentally impaired person's noncompliance with treatment "can be . . . the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse.") (citations, internal quotation marks, and brackets omitted). The Seventh Circuit has joined the circuits above in holding that an ALJ's minimum duty to consider possible explanations for noncompliance issues—before drawing a negative credibility inference—is heightened with claimants that have significant mental impairments. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (collecting cases); *see also Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006) (collecting authorities concluding that noncompliance is often a component of bipolar disorder, particularly with individuals that depend on low-income clinics for treatment).

The Seventh Circuit has also "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)). "The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Moore*, 743 F.3d at 1123 (citing *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)).

Here, the ALJ failed to confront significant evidence that Ashley R.'s mental impairments, including most notably bipolar disorder, borderline personality disorder, and schizoaffective disorder historically affected her treatment course. She was dissatisfied with one provider because

10

they kept changing her medications, she had tried a long list of medications over the years, and her new provider explained that she "might be a client who simply doesn't respond well to meds. . . ." (Filing No. 12-7 at 116.) Despite her frustration with medication changes, she also admitted she "never stayed on anything long enough to see if it worked," and she would get paranoid about side effects after researching medications on the internet. (Filing No. 12-7 at 151.) While Ashley R. was in treatment during the period at issue, her medications were repeatedly changed by her new provider as well. (Filing No. 12-7 at 122 (December 6, 2017); Filing No. 12-7 at 145 (February 14, 2018); Filing No. 12-7 at 143 (February 21, 2018); Filing No. 12-7 at 137 (March 15, 2018); Filing No. 12-7 at 134 (March 29, 2018); Filing No. 12-7 at 275-76 (May 4, 2018); Filing No. 12-7 at 278 (June 7, 2018); Filing No. 12-7 at 281 (July 10, 2018); Filing No. 12-7 at 288 (April 16, 2019); Filing No. 12-7 at 295 (August 13, 2019); Filing No. 12-7 at 299 (November 7, 2019); Filing No. 12-7 at 304 (November 13, 2019); Filing No. 12-7 at 308 (November 21, 2019); Filing No. 12-7 at 312 (December 12, 2019).)

The ALJ is required to consider the "side effects of any medication an individual takes or has taken to alleviate pain or other symptoms." SSR 16-3, 2017 WL 5180304, at *8. Ashley R. repeatedly reported side effects or her concerns about potential side effects with a wide array of medications, which often led to prescription changes. (Filing No. 12-7 at 106; Filing No. 12-7 at 116; Filing No. 12-7 at 122; Filing No. 12-7 at 132; Filing No. 12-7 at 138; Filing No. 12-7 at 141; Filing No. 12-7 at 144; Filing No. 12-7 at 151; Filing No. 12-7 at 187; Filing No. 12-7 at 276; Filing No. 12-7 at 278; Filing No. 12-7 at 294.)

Towards the end of the record, on December 12, 2019, Ashley R. reported that she "was finally on the best medication combo." (Filing No. 12-7 at 310.) However, at the hearing on January 29, 2020, she testified that her "voices [were] getting worse again," she had an

appointment to change her medications, and she had a history of medications initially reducing but not eliminating her suicidal ideations and hallucinations, but that the medications would slowly lose efficacy until she was staying up for days at a time, her voices were constant, and she had increased paranoia. (Filing No. 12-2 at 37-38.) At a minimum, the constant need for medication changes during the period at issue is inconsistent with the ALJ's conclusion that Ashley R.'s mental symptoms were adequately controlled by medications.

Moreover, the ALJ's failure to confront conflicting evidence is a pervasive issue that was not limited to just medication changes and reported side effects. The ALJ said little to nothing about Ashley R.'s well-documented inability to maintain relationships long term because of her personality disorder. Her treating provider reported that Ashley R. had a "lifetime pattern of this causing significant issues in her interpersonal relationships. Mood instability[ ] and angry outbursts have been historically treated with mood stabilizers – but with little improvement." (Filing No. 12-7 at 133-34.) She reported often getting in fights and being aggressive that caused "problems getting along with others, [but she] typically doesn't feel regret about how she acted until days later." (Filing No. 12-7 at 144.) She reported homicidal ideations concerning her boyfriend based on auditory command hallucinations. (Filing No. 12-7 at 201.) She needed coaching from a case manager including utilization of coping mechanisms to get through a court hearing while remaining calm and not arguing with the prosecutor or judge. (Filing No. 12-7 at 237.) She also needed coaching to meet with a Department of Child Services ("DCS") case worker about a claim that had been filed against her. (Filing No. 12-7 at 241.) Her treating mental health case worker reported that because of Ashley R.'s "impulsive behavior, and borderline [personality disorder] diagnosis, [she] struggles to communicate effectively with professional people and therefore requires coaching and guidance when meeting with DCS." (Filing No. 12-7 at 241.) She

12

also needed assistance filling out an insurance claim concerning a recent car accident because of her "disorganized thinking," "she was overwhelmed by the paperwork . . . ." (Filing No. 12-7 at 243.)

Later in July 2019, Ashley R. reported "having difficulties identifying any feelings other than detachment and anger. Recognizes her interactions with her children is often harsher than she would like. Taking medications as prescribed. Still has vague thoughts [regarding] suicide…." (Filing No. 12-7 at 364.) Her therapist observed her to be "frustrated by her children and would often 'yell' at them to go away while [they] were talking ([c]hildren appeared to be acting like normal young children to Therapist)." (Filing No. 12-7 at 358.) Ashley R.'s therapist counseled her "at length" about her "immediate reactions to anyone she felt was judging her by being verbally hostile and how that may end up creating the very fear of judgment [that she] feared." (Filing No. 12-7 at 358.) She reported being dissatisfied with her daughter's mental health treating providers "and how she lost her temper with them." (Filing No. 12-7 at 364.) Ashley R.'s therapist explained to her that what she says "often has merit, but her delivery skills can be abrasive." (Filing No. 12-7 at 364.)

In August 2019, Ashley R. wanted to stop attending therapy because "she didn't want to think about her past trauma and after sessions she would have increase[d] . . . self[-]harming thoughts and depression." (Filing No. 12-7 at 337.) She became "angry" when her provider informed her that she would have to get psychiatric care at another provider if she would not attend therapy because she was "not well enough at th[at] point to be meds only." (Filing No. 12-7 at 337.) The ALJ presented only the evidence that showed Ashley R. had some ability to interact with others. (*See* Filing No. 12-2 at 19.)

13

Often the ALJ conspicuously omitted relevant information that was on the same page of medical records that she cited to show Ashley R.'s improvement or capabilities. For instance, the ALJ concluded that Ashley R.'s "activities suggest a greater ability than she allege[d]." (Filing No. 12-2 at 24.) The activities detailed by the ALJ included Ashley R.'s ability to care for her children, take them to school, be involved in their schooling, converse with their teachers, make dinner for them, take them to an amusement park, get a birthday cake for her son, prepare a birthday dinner, have friends over for breakfast, bleach her hair, and several instances when she reported working. (Filing No. 12-2 at 23-24.) In July 2018, Ashley R. reported she "had full care of all 3 of her children since the beginning of [the] month and she sa[id] it [was] going well," but also "DCS was called on her again and she doesn't know why." (Filing No. 12-7 at 280.) In July 2019, at the same appointment that Ashley R. reported taking her children to an amusement park and being "able to maintain her mood/anger," she also reported being visited by the "police and DCS" for a "wellness check" because her children were playing outside unattended, and she "became very hostile to the police" until "eventually they contacted one of [her] old DCS [case] workers who met with [her] and assured her she wasn't in trouble and helped [her] calm down." (Filing No. 12-7 at 358.)

The ALJ referenced the fact that Ashley R. was working on several occasions, but she omitted the evidence about the result of her work attempts. Ashley R.'s therapist reported that she was fired from her last job at Pizza Hut for arguing with others. (Filing No. 12-6 at 37.) She also quit a job because of "some conflict with one of her [c]lients," (Filing No. 12-7 at 367), and treatment records reported that she often quit jobs rather than confronting her anger issues when problems arose, (Filing No. 12-7 at 345).

14

In May 2018, Ashley R.'s treatment provider, Aspire, recorded that she had called in between her appointments requesting refills of psychotropic medications that Aspire had not prescribed to her, she had also gone to another provider, Jane Pauley Community Health Center, to get medications without telling Aspire, and they told her she could no longer get medications from two providers. (Filing No. 12-7 at 274-75.) During the visit with Aspire, she reported "multiple stressors going on right now including her children being molested and attempting suicide and they are not in her custody." (Filing No. 12-7 at 274.) Ashley R. also attended the initial psychiatric medication evaluation with her Aspire case manager and reported that she was "upset with frequent medication changes" while treating with Aspire. (Filing No. 12-7 at 150.) In context, the incident appears to have minimal relevancy concerning the severity of Ashley R.'s symptoms.

The ALJ also reported that Ashley R. "alleged she could not afford medication, but smokes cigarettes, one pack per day, and was seen managing two smart phones in the waiting room[,] which indicates she has some sort of discretionary amount to spend." (Filing No. 12-2 at 24 (citation omitted).) The treatment record states that Ashley R. interrupted her appointment with her provider to answer one of the phones about her "food stamps," and had to be asked to finish the call after taking "10 minutes" away from her appointment. (Filing No. 12-7 at 116.) Ashley R. contends that this is an example of the ALJ discrediting her character that is no longer allowed according to SSR 16-3p. (Filing No. 14 at 25.) SSR 16-3p explains:

> Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person.

2017 WL 5180304, at *11. To the extent that Ashley R.'s discretionary income is relevant to evaluating her explanations for noncompliance, the example is borderline as to whether the ALJ impermissibly attacked her character. Regardless, the ALJ assumed facts that the record does not provide about Ashley R.'s ability to personally pay for cigarettes and cell phone service, or ownership of the multiple cell phones in her possession, and the ALJ entirely omitted the relevant reference to food stamp eligibility.

  The ALJ detailed that Ashley R. "alleged all days are bad and that she has suicidal ideation daily; yet review of the file shows this is unsupported." (Filing No. 12-2 at 24.) This is precisely the type of analysis that is permitted to discredit a claimant's subjective symptoms. But again, the ALJ relies on citations without confronting conflicting evidence in the same treatment records. For instance, the ALJ cited a record from March 15, 2018 that noted in the examination findings section that Ashley R. "[d]enied any suicidal/homicidal thoughts/plans/intent," (Filing No. 12-7 at 136), but in the interim history section from the same visit, her provider explained that she reported improvement with medication and denied "active [suicidal ideation] – but reports [that she] continues to hear voices at night telling her to harm herself [and] 'it's been like that for years'" (Filing No. 12-7 at 135). On October 12, 2018, Ashley R.'s case manager wrote a letter reporting that "she is highly suicidal most days or what we refer to as passive suicidal ideation." (Filing No. 12-7 at 219.) In fact, the record is replete with mental status examinations referencing Ashley R.'s thought content to include hearing "voices all the time," (Filing No. 12-7 at 285); hearing "voices during the day and at night. A man[']s voice repeats everything she has thought of, about suicide," (Filing No. 12-7 at 288); "[a]uditory hallucinations at night, they start when it gets dark," (Filing No. 12-7 at 291); "[r]eports constant voices but this may be [a] misinterpretation of internal dialogue," and "[r]eports daily thoughts of suicide for many years. Says she thinks about how to

16

do it routinely but [has] no desire to act on this," (Filing No. 12-7 at 294).  The ALJ presented a skewed version of the record.

At a minimum, the ALJ's failure to confront conflicting evidence precludes meaningful review of her credibility evaluation.  The shear number of relevant omissions convinces the Court the ALJ's credibility evaluation is insufficient.  Accordingly, remand is necessary for further consideration of Ashley R.'s subjective symptoms and mental RFC.

## V.     CONCLUSION

For the reasons stated above, the final decision of the Commissioner is **REMANDED** for further proceedings consistent with this Entry as authorized by Sentence Four of 42 U.S.C. § 405(g).

**SO ORDERED.**

Date:  2/25/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kirsten Elaine Wold
HANKEY LAW OFFICE
kew@hankeylaw.com

Alison T. Schwartz
SOCIAL SECURITY ADMINISTRATION
alison.schwartz@ssa.gov

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov